UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>BRIAN RICHARD HART,<br><br>                    Defendant. | Case No. 2:22-cr-00134-DCN-2<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Brian Hart's Motion to Suppress. Dkt. 53.[1] On June 26, 2023, the Court held an evidentiary hearing and took the matter under advisement. Upon review, and for the reasons set forth below, the Court DENIES Hart's Motion.

## II. BACKGROUND

On the evening of May 24, 2022, Corporal Seth Green of the Idaho State Police followed a Ford sedan bearing Montana license plates as it traveled eastbound on Interstate

---

[1] Hart also filed an objection to the Government's response, arguing the Court should strike it entirely because it was filed one day after the applicable deadline. Dkt. 61. The Government never addressed—in writing or verbally at the hearing—Hart's objection. The Court does not know why the Government was one day late. Procedural rules, including simple scheduling rules, must be followed to ensure fair and prompt access to justice. The Government is admonished to ensure all briefing complies with applicable deadlines. Nevertheless, given the minimal delay and the absence of prejudice to Hart, the Court will OVERRULE the objection, the response will stand, and the Court will analyze the substance and merits of the motion and briefing.

90 in Kootenai County, Idaho. Green observed the vehicle traveling below the speed limit and weaving back and forth within its lane of travel.

Based upon his training and experience—and the erratic driving pattern—Green believed the driver of the Ford may have been under the influence of drugs or alcohol.

Green followed the Ford as it signaled and took Exit 22, which connects Interstate 90 to State Highway 97. As the vehicle traveled up the off-ramp, its right turn signal remained activated for most of the ramp's length. During this time, Green observed the front passenger lean down to his left multiple times. After stopping at the end of the exit ramp, the Ford then abruptly activated its *left* turn signal for approximately one second before turning left (north) onto Highway 97.

Highway 97, particularly the northern route from Exit 22, is primarily used for local traffic. Because the Ford bore Montana plates (and the northern route of Highway 97 does not lead to Montana), and because the driver appeared to be unsure about where he was going, Green suspected the vehicle had taken the exit specifically to avoid his presence. Shortly after the vehicle turned north, Green activated his emergency lights to stop the Ford for, among other things, failure to activate its turn signal for one hundred feet before turning left onto Highway 97. As he followed the vehicle, Green also observed several cracks in the Ford's windshield which appeared to obscure the driver's vision.

After he activated his emergency lights, but prior to the vehicle stopping, Green again observed the passenger moving in and around the front passenger floorboard area. Given the furtive movement, Green believed the passenger was attempting to hide something. Ultimately, the vehicle stopped in a gravel turnout just off Highway 97.

Green approached the front passenger side of the Ford and engaged with the occupants. The driver of the vehicle was Robert Wilson; the passenger was Brian Hart.

Green observed that Wilson had a socket wrench in his hand. Wilson indicated he was having trouble with the Ford's front right tire and was trying to find a spot where he could take care of it. Green did not observe any issues with the front right tire from his vantage point. After talking with him, Green suspected Wilson may have used a stimulant but did not believe he was under the influence of alcohol. In talking with Hart, however, Green noticed signs of drug use and believed Hart to be "intoxicated by a controlled substance." Dkt. 53-1, at 2. Green also noticed a backpack on the floor between Hart's legs.

Green discussed the reasons for the stop and asked both occupants for various documents. When Wilson opened the glovebox to look for his license, registration, and insurance, Green observed multiple torch lighters and a balloon. The presence of these items, along with the physical indicators of possible recent drug use that Green observed on Wilson and Hart,[2] led Green to conclude such items were likely drug paraphernalia.

When asked for his identification, Hart said that he did not have one but provided his full name, birthdate, and place of birth. Green ran both occupants through radio dispatch, beginning with Wilson. After Wilson provided Green with paperwork for the Ford, they discussed the fact that the vehicle registration was expired and there was no insurance coverage for Wilson as the driver.

---

[2] For example, in his affidavit, Green indicated he noticed that Wilson had "sunken cheekbones, open sores on his body, was speaking quickly and appeared unable to sit still moving from side to side in his seat." Dkt. 53-1, at 2. He also noted that "Hart had flaccid facial muscles, slurred and slowed speech, open sores on his body, scarring on his arms appearing to be from hypodermic needle use and had slouched shoulders." *Id*. These observations, according to Green, were "signs of possible recent drug use." *Id*.

While waiting for the returns on Wilson, Green asked Hart if he had given him his real name, noting that normally when someone tells him they don't have any identification, it is because he or she has outstanding warrants. Hart confirmed that he provided his real name and explained why he did not have any identification. Green then told Wilson and Hart that he believed there was drug paraphernalia in the vehicle and that he was going to run his K9 around the car to investigate. When Green asked whether there was any paraphernalia in the vehicle, both occupants denied possessing anything of that nature.

Green then asked Hart to step out of the vehicle. The following exchange took place:

> Green: Alright man do you have any problem with me searching your person? You got—
> Hart: No.
> Green: —Pockets and crap everywhere. Ok, alright.[3]

Green then searched Hart and found a tooter[4] and piece of foil, both with apparent drug residue, in his pants pocket.

Around the same time, dispatch informed Green that Hart had an outstanding arrest warrant for failure to appear in a misdemeanor DUI case out of Bannock County, Idaho. Upon learning Hart had a misdemeanor warrant, Green handcuffed Hart. While doing so, Green informed Hart the warrant might not be extraditable, i.e. that Bannock County might not even want to bring Hart back for prosecution, and that he was placing Hart in handcuffs because he was by himself and wanted to ensure his safety. Green indicated he might take

---

[3] Green's dashcam video of the incident was provided during the hearing as Defense Exhibit E and is on file with the Court. The statements quoted in this decision come from that exhibit.

[4] A "tooter" is a tube, usually cut from a straw, used to inhale drugs.

Hart out of the handcuffs at a later point. Green and Hart then had a brief conversation about the paraphernalia in Hart's pocket, which Hart referred to as "garbage" he thought he had thrown away. Green then directed Hart to stand against the front of his patrol vehicle.

Green next asked Wilson to step out of the Ford and frisked him after obtaining Wilson's consent. He then asked Wilson several questions about his relationship with Hart and his prior drug use before directing him to stand by some garbage cans away from Hart and the vehicle. Wilson told Green that he had only known Hart for a few weeks, and that the vehicle belonged to Hart.

Green then began searching the vehicle, beginning with the bag that had been in the front passenger seat between Hart's feet. Around the same time, dispatch confirmed Hart's warrant. Green replied, "Copy, show him in custody," but did not inform Hart of this. As Green took the bag out of the front passenger seat, he walked it to the trunk of the vehicle a few feet away from where Hart was standing, asking "So whose ride is this?" Hart responded that he borrowed the Ford from a friend but was authorized to have the vehicle. While Green searched the bag, Hart asked Green a question about "dabs," apparently in connection with something found in his bag, and Green replied: "But that's not for dabs,[5] dude. That's for fentanyl or heroin, usually fentanyl these days. I'm a K9 officer, man, I'm not—all I do is drug work." Hart then said something to the effect of: "I thought it was legal."

---

[5] "Dab" or "dabs" is a slang term for concentrated marijuana.

Inside the backpack, Green found paraphernalia, apparent methamphetamine, and numerous financial and identification cards bearing the names of various individuals.

After finding these items, Green informed Wilson that he suspected there were additional drugs in the vehicle and that he would be searching the Ford. Green then handcuffed Wilson while telling him that, even though he was not in trouble, he needed to handcuff him because, again, he was by himself and wanted to ensure safety.

After searching the vehicle, Green returned to Hart, conducted a more complete search of his person, and told him that he was going to be arrested due to his outstanding warrant. While searching Hart incident to his arrest, Green found twelve fentanyl pills hidden in the groin area of Hart's pants, as well as a methamphetamine pipe in Hart's jacket pocket. Hart and Green then briefly discussed the pills and paraphernalia found on his person, as well as the identification cards found in the bag. At that point, Green informed Hart of his *Miranda* rights.

Idaho State Police Trooper Timothy Meyers then arrived on scene to assist Green. Green then arrested, Mirandized, and questioned Wilson about Hart and the items found in the vehicle during the initial search. Around this time, Wilson admitted to Green that his license was suspended.

Green continued searching the vehicle and located multiple additional items of paraphernalia throughout the passenger compartment. Moving to the trunk, he found approximately 204.1 grams of methamphetamine and 680 fentanyl pills inside of a backpack. Ultimately, Trooper Meyers inventoried the vehicle, which was then towed.

Hart now moves to suppress all evidence seized during the stop on the grounds that

MEMORANDUM DECISION AND ORDER - 6

law enforcement had no authority to pull the Ford over, the officers extended the stop unnecessarily, the search of his person was illegal, the search of the vehicle was illegal, and he was questioned in violation of *Miranda*.

The Government opposes the motion.

### III. LEGAL STANDARD

The Fourth Amendment protects citizens from unreasonable searches and seizures by the government. U.S. Const. amend. IV. Though "[t]he Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands," *United States v. Leon*, 468 U.S. 897, 906 (1984), the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect," *United States v. Calandra*, 414 U.S. 338, 348 (1974). Under the exclusionary rule, "illegally seized evidence" cannot be used "against the search victim in a criminal trial." *Id.* at 350; *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

An exception to the warrant requirement that is pertinent to this case is a seizure for a traffic violation. *Rodriquez v. United States,* 575 U.S. 348, 354 (2015). Such a seizure is only justified if the officer diligently pursues the purpose of the stop; any deviations or delays for unrelated investigations violate the driver's Fourth Amendment right, unless supported by independent reasonable suspicion. *Id*. at 354-55.

Additionally, the automobile exception to the warrant requirement permits police to search a vehicle when the car is "readily mobile" and "probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (cleaned up). The police may search both an automobile and the containers within it "where they

have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

That said, if no exceptions to the exclusionary rule apply, evidence must be suppressed. Evidence that the government obtains in violation of the Fourth Amendment is generally excluded from the prosecution of the alleged violator. *Wong Sun v. United States,* 371 U.S. 471, 484-85 (1963). Further, evidence discovered through "exploitation of" an illegal search or seizure, must also be suppressed as "fruit of the poisonous tree." *Id*. at 488 (1963).

When a defendant challenges a warrantless search or seizure, the government bears the burden of establishing, by a preponderance of evidence, that the search or seizure did not violate the Fourth Amendment. *See United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951).

## IV. ANALYSIS

Hart argues the traffic stop and his initial detention, seizure, and search were unlawful. He also contends law enforcement impermissibly extended the stop, unlawfully searched his backpack and the vehicle, and questioned him in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

Considering these myriad violations, Hart asserts all evidence against him must be suppressed. The Court will address each issue below.

### A.  Initial Stop

The stop of a vehicle is a seizure of its occupants and is, therefore, subject to the

Fourth Amendment. *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Brendlin v. California*, 551 U.S. 249, 255 (2007); *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *Berkemer v. McCarty,* 468 U.S. 420, 436–37 (1984) ("We have long acknowledged that stopping an automobile and detaining its occupants constitute a seizure." (cleaned up)).

Under the Fourth Amendment, government officials may conduct an investigatory stop of a vehicle only if they possess "reasonable suspicion: a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (cleaned up). Such reasonable suspicion "requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *Id*. at 1189 (cleaned up). Conduct that, when viewed alone, might be innocent behavior, when taken together, can form the basis of reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1080 (9th Cir. 2013) (en banc) ("A series of innocent acts may be enough for reasonable suspicion justifying an investigative stop.").

In addition to criminal activity, probable cause that a traffic violation has been committed makes a stop per se reasonable. *Whren*, 517 U.S. at 810. If an officer observes a traffic violation, that officer may conduct a traffic stop for the violation even if he also has another reason to suspect that a defendant is engaged in criminal activity. *Id.*; *see also United States v. King*, 244 F.3d 736, 738 (9th Cir. 2001).

Here, Hart asserts Green lacked reasonable and articulable suspicion supporting the stop of the vehicle. He contends "none of the[] reasons" Green provided in his affidavit

"standing alone, indicate a violation of Idaho Traffic Laws." Dkt. 53, at 8. The Court disagrees.

Setting aside the weaving and the cracks in the windshield—which arguably are also violations of Idaho law—Green had reasonable suspicion to stop the vehicle because he witnessed a traffic violation.

Idaho Code outlines that:

> A signal of intention to turn or move right or left when required shall be given continuously to warn other traffic. On controlled access highways and before turning from a parked position, the signal shall be given continuously for not less than five (5) seconds and, in all other instances, for not less than the last one hundred (100) feet traveled by the vehicle before turning.

Idaho Code § 49-808(2). The video in this case is clear. Wilson was stopped at the stop sign at the top of Exit 22. Wilson activated his left turn signal. He then turned left within two seconds of activating that signal. This was a violation of the law and Green could reasonably stop the Ford for failing to properly signal. The Court finds the initial stop was lawful.

## B. Extension of Seizure

Hart next claims the stop was impermissibly extended because Green discussed matters that were not reasonably related to the justification for the stop—the failure to properly signal.

Accordingly, the Court must first determine whether Green acted outside of the stop's mission. If the Court finds there was such a delay, it must next consider whether the delay was justified by a reasonable suspicion of other criminal activity. Here, the Court finds that Green did not impermissibly delay the stop, but, even if he did, it was because

he had new, articulable suspicion of further criminal activity.

A seizure, though initially "lawful at its inception, can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Fourth Amendment's prohibition on unreasonable seizures." *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (cleaned up). "A seizure that is justified solely by the interest in issuing a ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Further, an officer must initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop. Such reasonably related questions may include addressing the traffic violation, attending to safety concerns, checking the driver's license, registration, and proof of insurance, and determining whether there are outstanding warrants against the driver. *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015). The officer may expand the scope of the stop only if he notices particularized, objective factors arousing his suspicion. *Id.*; *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) ("[A]n officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion."). Conversely, an inchoate and unparticularized suspicion or "hunch" cannot withstand scrutiny under the Fourth Amendment. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Although Hart contends Green unlawfully prolonged the traffic stop, the facts indicate otherwise.

First, Green did not extend the stop beyond his initial purpose of investigating a traffic violation. While it took some time waiting for returns from dispatch, securing such information was related to the "mission" of the stop. Green was making normal inquires of

the driver and passenger regarding their credentials and information for the vehicle.[6] Complicating matters was the fact that Hart did not have any identification.

Second, while Wilson was looking for various documents, Green noticed items in the glove compartment indicative of drug use. This, combined with his observations about Wilson and Hart's demeanor, was enough to arouse Green's suspicion that further criminal activity was afoot. Consistent with *Rodriguez*, Green then permissibly expanded the scope of the stop.

The Court does not find any issues with Green asking Wilson and Hart questions— and generally "extending" the stop—because he already believed the occupants had taken controlled substances and then noticed materials suggestive of drug activity.

In sum, Green did not unlawfully extend the stop. And, even were the Court to determine Green deviated from his original "mission" and prolonged the stop, the delay was justified because Green had obtained new reasonable suspicion of criminal activity.

## C. Search of Hart's Person

Warrantless searches are per se unreasonable, subject to a few specifically established and "well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218,

---

[6] Hart argues extensively that Green should not have focused so much on him because he was simply the passenger. The Court does not see a relevant difference. While Wilson was the driver, Hart was the person seen moving furtively prior to the stop, who appeared to be attempting to hide something, and who seemed to Green to be under the influence of drugs. Hart wants the Court to analyze this situation on a person-by-person basis and contends Green's *shift* to asking Hart questions "delayed" Green's inquiry into Wilson— the primary target—which, in turn, delayed the whole stop unlawfully. The Court disagrees. Green had reasons to verify the identity of both the driver and the passenger, as neither owned the vehicle and both appeared to be engaged in drug use. Given this, questioning Hart while Wilson looked for documents was a logical thing to do. This was even more relevant after Green observed—while waiting for Wilson to produce the vehicle's registration and insurance information—what he believed to be drug paraphernalia in the vehicle in and around Hart.

219, (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is a search conducted pursuant to consent. *Id.*; *see also United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) ("[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible.").

Here, the Government contends that Hart's response of "no" to Green's question "do you have any problem with me searching your person" constituted consent and justified the warrantless search.

Hart counters that it is difficult to hear his response on the dashcam footage,[7] that Green formulated his question oddly, and that he could not give consent voluntarily because he was inebriated.[8]

First, the Court agrees Hart's response is difficult to hear. It does, however, sound as though he mumbled "no" when Green asked whether he had any problem being searched. Additionally, Green has sworn under oath that Hart gave him consent. In the absence of any evidence to the contrary, there is no reason to doubt Green's representations that confirm what is difficult to hear on video.

Second, the Court also agrees the structure of Green's question was not a work of art. But it need not be. Hart does not present evidence or cite any caselaw to suggest a consent question eliciting a negative response ("do you have a problem with . . .") has been

---

[7] Although Hart argues it is difficult to hear his response, he never asserts he said anything other than "no" in response to Green's request to search his person.

[8] Hart does not come right out and say this. He reviews the voluntariness factors and claims the Government cannot prove he gave consent voluntarily. Nevertheless, the implication of Hart's argument is that he was too intoxicated to give valid consent.

deemed better or worse than a consent question eliciting a positive response ("do you consent to . . .").

And finally, although Hart was likely under the influence of controlled substances at the time of these events, this does not mean he could not give his consent. Whether consent is voluntary is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. So long as consent was freely and voluntarily given and not the result of duress or coercion, express or implied, the consent will stand. *Id.*

In this case, Hart was not handcuffed or under arrest when asked to consent to the search. Green was the only officer on scene and his tone was conversational and non-threatening. He did not have his gun drawn or otherwise make a showing of force that could be interpreted as coercive or duress-inducing. There is nothing to suggest Hart was "pressured" into giving his consent. What's more, Hart had already been talking with Green about the reasons for his lack of identification (among other things). Thus, even though likely inebriated, Hart was able to carry on a conversation with Green and Green was able to understand him.

In sum, the Court agrees with Hart that it is difficult to hear his answer. Even so, there is no evidence to suggest Hart said anything other than "no" when asked if he objected to being searched. And while the Court understands Hart's observation about Green's phraseology, such does not carry the day. Based on the totality of the circumstances, Hart freely, voluntarily, and intelligently provided Green consent to search his person, and the ensuing search was valid and constitutional.

### D. Search of the Backpack and Vehicle

Hart next asserts Green lacked probable cause to search Hart's backpack and the vehicle.

Under the "automobile exception" to the warrant requirement, government officials may validly search a defendant's vehicle without first obtaining a warrant if the search is supported by probable cause. *See United States v. Ross*, 456 U.S. 798, 820–21 (1982); *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015). "Probable cause exists 'when police officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" *Wallace*, 213 F.3d at 1219 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

Here, the Court has already found that the prolonged seizure—if it could even be construed as such—was lawful because Green observed both signs of recent drug use and drug paraphernalia. The Court has also found Green's search of Hart was lawful. During that search, Green found more drug paraphernalia. The totality of such circumstances provided sufficient probable cause to lawfully search the vehicle.

Under the automobile exception to the warrant requirement, "if the police have probable cause to search a lawfully stopped vehicle, then the police may search every part of the vehicle and its contents that may conceal the object of the search." *United States v. Vasquez*, 858 F.2d 1387, 1391 (9th Cir. 1988) (cleaned up). Accordingly, Green's search of the backpack, and eventually the whole vehicle, was reasonable, lawful, and

constitutional.[9]

### E. Miranda

Finally, Hart argues Green impermissibly questioned him in violation of *Miranda* and that all his statements prior to receiving those warnings must be suppressed.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Prior to any custodial interrogation, law enforcement must provide certain warnings to suspects to ensure they are advised of their Fifth Amendment rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

The threshold question, however, is at what point is a defendant officially "in custody," triggering the need for *Miranda* warnings.

A police officer is required to provide *Miranda* warnings when a defendant has been taken into custody or is otherwise deprived of his freedom of action in a significant way. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Hart argues he was in custody once Green handcuffed him; the Government alleges he was not in custody until later when Green conducted a full search of Hart and told him he was officially going to be arrested due to his outstanding warrant.

This question is always vexing. There is a fine line between being "detained," being "in custody," and being "arrested," and that line is not always clear. An officer may detain

---

[9] The Government also argues that the "inevitable discovery doctrine" also applies and that the contraband would have been found regardless of whether Green searched the vehicle during the traffic stop because, once Hart and Wilson were arrested, the vehicle would have been searched prior to impounding. This is another independent reason justifying the search, but the Court need not analyze it further as it has already found the automobile exception applies.

a person no longer than necessary to confirm or dispel suspicion. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) (explaining a brief stop of a suspicious individual to determine his identity or maintain status quo while obtaining more information may be reasonable in light of facts known to officer at time). A seizure or detention may, however, ripen into a de facto arrest for which probable cause is required.[10] There is no "litmus-paper test . . . for determining when a seizure exceeds the bounds of an investigative [*Terry*] stop." *Florida v. Royer*, 460 U.S. 491, 506 (1983). Whether an arrest has occurred "depends on all of the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop." *United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981). The Court must "review the situation from the perspective of the person seized," assessing whether "a reasonable innocent person in these circumstances would . . . have felt free to leave after brief questioning." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295–96 (9th Cir. 1988); *see also Patterson*, 648 F.2d at 632 (clarifying that "the question is whether, under all of the circumstances, 'a reasonable person would conclude he was under arrest'") (citing *United States v. Harrington,* 636 F.2d 1182, 1186 (9th Cir. 1981)).

The Court agrees with the Government that Hart was not under arrest during the initial conversations he had with Green. Green specifically told Hart the only reason he was handcuffing him was because he was the only officer on scene, i.e. for his safety. The "Supreme Court has permitted limited intrusions on a suspect's liberty during an

---

[10] It is well-settled that a warrantless arrest must be based upon probable cause. *Ker v. State of Cal.*, 374 U.S. 23 (1963); *Brinegar v. United States*, 338 U.S. 160 (1949); *Carroll v. United States*, 267 U.S. 132 (1925).

MEMORANDUM DECISION AND ORDER - 17

investigatory stop to protect the officer's safety[.]" *United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)). Because Green was without backup and outnumbered by the Hart and Wilson, handcuffing Hart was reasonable and did not convert the stop into a formal arrest. *Alexander v. Cty. of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable" in the course of a traffic stop); *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) ("[O]fficers with a particularized basis to believe that a situation may pose safety risks may handcuff or point a gun at an individual without converting an investigation detention into an arrest.").

Green also told Hart he might take the cuffs off at a later point, and thus conveyed that Hart was not yet under arrest. Further, as noted, Green was not combative, his tone was conversational and non-threatening, and he did not draw his weapon or otherwise make a showing of force.[11] Green did not even place Hart in his police vehicle. Under such circumstances, Hart's detention did not amount to an arrest. *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014) ("In looking at the totality of the circumstances, we examine . . . the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted.").

To be sure, Hart was handcuffed. It would have been difficult, if not impossible, for

---

[11] Although Green responded to dispatch that Hart was "in custody," he did not relay this information to Hart.

him to "leave." However, even a "brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a [traffic] stop and does not necessarily convert the stop into an arrest." *Patterson*, 648 F.2d at 632–33. Again, against the backdrop of Green's comments and demeanor, a reasonable person in Hart's shoes would have understood that his detention was a temporary measure to ensure Green's safety; nothing more. This idea is supported by the fact that Green did the exact same thing to Wilson: he told him he was *not* under arrest but that he was handcuffing him because he was on patrol alone.

While the overarching legal principle about custody and *Miranda* are the most important as it relates to this argument, the Court will briefly address the three fleeting conversations Green and Hart had before Hart was given his *Miranda* warnings, and why Hart's attempt to suppress these statements fails.

The first interaction occurred after Green handcuffed Hart, when the two briefly discussed the paraphernalia in Hart's pocket. As explained above, Hart was not in custody at this point, and *Miranda* warnings were not yet required. As such, this passing conversation was not the product of custodial interrogation and need not be suppressed.

The second interaction occurred a few minutes later after Green took the bag that had been between Hart's feet out of the vehicle and asked, "So whose ride is this?" Hart responded that he procured the Ford, that it was his friend's, and that he was allowed to have the vehicle. While Green searched the bag, *Hart asked Green* a question about dabs that he got in Washington, apparently in connection with something found in the bag. In addition to the fact that Hart was not in custody during these conversations, the initial part

of the second statement was spontaneous and not the product of any police questioning.

The third interaction occurred as Green performed a complete search of Hart and told him he was formally under arrest. Green did not read Hart his *Miranda* rights until three minutes later—*after* Hart had made multiple statements. The Government has conceded, however, that once Green told Hart he was under arrest, his responses were the product of custodial interrogation and required *Miranda* warnings. It has indicated it will *not* seek to introduce any statements made during this three-minute timeframe after Hart was arrested but before he was *Mirandized*. The Court will hold the Government to this representation, and any statements Hart made during this three-minute timeframe will not be admitted at trial.

In sum, the Court finds Hart was not in custody until Green conducted a full search of his person and told him he was under arrest on the Bannock County warrant. Hart, although restrained by handcuffs, was not under arrest and had specifically been informed he was handcuffed to protect Green's safety. The Court finds Green did not question Hart unlawfully in violation of *Miranda* and, as outlined above, his statements will not be suppressed.[12]

## V. CONCLUSION

The Court finds that the initial stop, any extension of the stop, and the search of the backpack and vehicle were reasonable and constitutional.

Green observed a traffic violation which gave him probable cause to stop the

---

[12] Except for the timeframe and statements already conceded by the Government.

vehicle. Upon interacting with Hart and Wilson, Green did not deviate from the purpose of the stop, but even if he had, new reasonable suspicion arose when he observed what he believed to be drug paraphernalia in the glove compartment. That, coupled with his prior observations about the occupants of the Ford, allowed Hart to extend the stop beyond its original purpose to search Hart. Upon finding more drug paraphernalia on Hart, Green then had reasonable suspicion sufficient to justify a search of the backpack and vehicle. None of these actions, or their resulting discoveries, need be suppressed. Each was constitutional and premised on reasonable and articulatable suspicion.

Further, the Court finds Green did not violate Hart's Fifth Amendment rights by failing to give him *Miranda* warnings initially because Hart was only temporarily detained for officer safety; he was not in custody. Anything said before Hart was formally arrested need not be suppressed.

## VI. ORDER

1. Hart's Motion to Suppress (Dkt. 53) is DENIED in its entirety.

DATED: July 24, 2023

David C. Nye
Chief U.S. District Court Judge